**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BYRON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 07 C 4342 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| CITY OF CHICAGO HEIGHTS, OFFICER | ) | |
| ROGER WILSON, OFFICER BENJAMIN | ) | |
| HOFRICHTER, and OFFICER JOHN STOKES | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**Introduction**

This is an excessive force case. Plaintiff Byron Smith alleges that one of the three

defendant police officers intentionally drove a police car over plaintiff's left ankle after he had

surrendered by getting out of the SUV he had been driving and putting his hands on the hood. He

further alleges that one of the officers then handcuffed him face down and hit him on the back of

the head with a blunt object, perhaps a gun. The defendants are moving for summary judgment

on all four counts in the complaint. Defendants' primary argument is factual. They argue that

plaintiff cannot show that any of the officers drove the car or hit him on the head.

**Facts**

Both sides agree on many facts, particularly those leading up to and after the alleged

injuries, but they disagree about the events after plaintiff got out of his car until he was

-1-

handcuffed and then (allegedly) hit on the head. The critical piece of evidence is plaintiff's deposition testimony. In a twist from the typical case, defendants rely heavily on this testimony, believing that it exonerates them, while plaintiff backs away from his own testimony and shifts his theory somewhat in his response brief. Accordingly, we begin with a description of events as taken from plaintiff's deposition.

In the evening of May 9, 2006, plaintiff was watching tv with a friend and drinking cognac. He drank several glasses and felt intoxicated. Around 2 a.m., he went outside to hang out with several men there. Several hours later, around 4:30 a.m., one of the men asked plaintiff to drive him and another man around in the man's SUV. During this joyride, the men asked plaintiff to pull over into Lexington Circle in Ford Heights. There, the two passengers got out and began shooting rifles which had been in their pant legs, with one firing an AK-47, the other a weapon known as an SKS.

With the two men back in the car, plaintiff continued driving and then saw flashing police lights in his rearview mirror. He sped away. He did so, he explained in his deposition, because he didn't want to go to jail (he was on probation for a unlawful use of a firearm and had a night curfew) and because he was afraid of the two men with guns who were screaming at him to "go." After four or five minutes in a car chase, plaintiff pulled the SUV off the road into an area where there were bushes leading up to a hill (referred to as a berm) on which an old railroad track used to run.

As plaintiff pulled the car to a stop a few feet from the hill, the two passengers jumped out of the car and ran up the hill trying to get away from police. Plaintiff says he decided to surrender. He got out and put his hands on the left side of the front of the hood of the SUV. The

police car that had been chasing plaintiff pulled up behind plaintiff's SUV. The officer in the

passenger seat of the police car, defendant Roger Wilson, got out and chased after the two men

running up the hill.

At this point, we reach the critical part of plaintiff's deposition testimony (pp. 49-50).

Plaintiff testified that the driver of the police car, which everyone now agrees would have to be

Officer Stokes, got out of the police cruiser and said "don't move." Before Stokes got up to

where plaintiff was standing, another vehicle was already coming towards plaintiff. This second

police car, according to plaintiff, was a "marked squad car." Asked whether the second car could

have been a police SUV, plaintiff said it was a regular police car.

As the police squad car came towards plaintiff, he tried to get out of the way by scooting

around to the front of the SUV, but his left leg was clipped near the ankle and then his body was

pinned against the side of the hill. Stokes told the driver of the car to pull it back to free

plaintiff's body.  When he did so, plaintiff fell to the ground face down.

As plaintiff lay on the ground, someone -- plaintiff now claims it was Officer Stokes --

put handcuffs on him and said "I ought to fucking kill you" and hit him on the back of the head

with a hard object. Plantiff speculates it could have been a gun. Plaintiff couldn't see the

officer's face because plaintiff was lying face down.  When plaintiff tried to turn around to see

who the person was, the officer sprayed mace in plaintiff's face. Eventually other police officers

arrived and a dog was brought over to sniff plaintiff.   Plaintiff laid there four or five minutes

until he was placed in an ambulance and taken to the hospital.

To summarize, according to this testimony, Officer Stokes was standing near plaintiff

when another officer drove the police car over plaintiff's leg, meaning Stokes was not the driver.

However, in his response brief, plaintiff backtracks from this version of events and alleges that Officer Stokes was in fact the driver of the car, as well as the person who later hit plaintiff on the head. Plaintiff also in his response brief states that the other two officer defendants were not around because they ran off chasing the two passengers from plaintiff's SUV. In other words, plaintiff has now focused his entire case on Officer Stokes.[1]

When the paramedics arrived, they noticed that plaintiff had a cut on the back of his head. One of the paramedics testified that plaintiff complained that he had been maced and that his eyes were burning.

Plaintiff was taken to St. James Hospital in Olympia Fields, a trauma center where patients with severe injuries are taken. Plaintiff told the emergency room staff that his leg had been run over by a car and that someone hit him on the head. Doctors concluded that plaintiff had an open fracture, grade 3B, and that dirt, gravel, and debris were ground into his bone and subcutaneous tissues. The fibula was broken into more than two pieces; the tibia bone was torn off the talus; and the deltoid ligament was completely ruptured. The bone was protruding from a five inch long cut on the inside of the ankle.

The two emergency room doctors who worked on plaintiff – Drs. Merlotti and Ingram – concluded to a high degree of medical certainty that plaintiff's leg injury came from being hit by

---

[1]*See* Pl. Resp. at 5 ("[plaintiff] was struck by the marked Chicago Heights police cruiser" and "said vehicle was driven by Officer Stokes"); at 6 ("the cruiser which intentionally crashed into him was drive[n] by Officer Stokes"); at 7 ("of the three officers present at the scene, only Officer Stokes could have been the driver"); at 8 ("Officer Stokes struck him in the head with a blunt object"); at 9 ("[Plaintiff] can, through circumstantial evidence, prove [that] Officer Stokes was the one that hit him"); *id.* ("At the time [Officer Stokes hit plaintiff on the head], Officers Wilson and Hofrichter were chasing the SUV's passengers").

a car and that the force of the injuries was such that it would not have come from stepping on an uneven surface and turning your ankle.

Plaintiff's leg injury did not heal quickly. After he went to prison, the leg became infected, requiring a month-long hospital stay. (Pl. Dep. 83-84.) Surgery was preformed and, at one point, plaintiff was told there was a likelihood he would lose his foot. (Pl. Dep. 85, 114.) Plaintiff says his injuries are permanent. He walks with a limp, has ongoing pain in his ankle, and can't play basketball. (Pl. Dep. 111-12.) As for his head wound, staples were put in and he does not have any long-term problems from that injury.

We now summarize defendants' view of the facts. Aside from the critical part of the encounter, defendants generally agree with the facts set forth above, although they add a few more contextual facts and tell the story from the officers' perspective. They describe how they were on patrol that night and received news of a shooting by men in a gold SUV and that one of the men in the car might by Michael Caraway, a man known to officers as being involved in narcotics and shootings. When Officers Stokes and Wilson spotted a gold SUV, they called in the license plate number and confirmed that it was Caraway's SUV.

After plaintiff stopped his SUV by the hill, Officers Wilson and Hofrichter say they chased the two passengers up the hill and thus were not around plaintiff. This leaves Officer Stokes as the only one around.

Officer Stokes testified in his deposition that when the SUV pulled to a stop, he focused on plaintiff. Stokes said he was able to see plaintiff during the entire encounter. According to Stokes, plaintiff jumped out of the car and tried to run away, going through the bushes and up the hill but that he stumbled and fell to all fours:

> [Plaintiff was] [g]oing up the berm[;] he was on his hands and feet trying to climb up and trying to hoist himself up using the trees and the bushes. By the time he got to the top of the berm, he never stood up, he just laid down flat and just said "okay, okay, I give up," [and] he laid down flat with his arms out in a cross-like figure and just [said] "okay, I give up."

(Dep. 107.)  Officer Stokes, his gun drawn, climbed up to the top of the berm.  He saw plaintiff face down and immediately handcuffed him.  Then Stokes went halfway back down the side of the hill to make sure the other passengers of the SUV weren't shooting at him. But he was only four or five feet from plaintiff and could still see him. Stokes waited for two or three minutes, during which time he observed plaintiff.  Plaintiff never tried to get up and didn't say anything or complain about any injuries.

Eventually, a police officer named Howard arrived.  Stokes was telling Howard what happened when the two men looked down at plaintiff and noticed his bone was protruding from the skin. This was the first time Stokes noticed plaintiff's injury. An ambulance was called. Stokes waited there until the paramedics got plaintiff.  Stokes denies hitting plaintiff on the head, and says he never saw anyone else hit him on the head.

## **Analysis**

Given the statements in plaintiff's response brief (*see infra* Footnote 1), we will grant summary judgment to Officers Wilson and Hofrichter. As plaintiff now concedes, all witnesses have stated that these two officers left the immediate area to chase after the two fleeing passengers from plaintiff's SUV and thus were not around when plaintiff was apprehended and allegedly injured.  We can find no argument in plaintiff's brief for why these two officers could be held responsible for the alleged actions. This leaves three issues for resolution.

## I.     The Fact Question.

Defendants' main argument is their claim that plaintiff does not have enough evidence to establish that one of the officers drove the car over his leg and that one of them hit him over the head.  Of course, in assessing this question, we view the facts through the lens of Rule 56, viewing any factual disputes in plaintiff's favor and taking all reasonable inferences in his favor.

Defendants employ a type of divide and conquer strategy.  Focusing on the allegation concerning the car, defendants first argue that neither Officer Wilson or Hofrichter could have been the driver because they were chasing after the fleeing passengers.  Defendants next argue that, based on plaintiff's own testimony, Officer Stokes had gotten outside of his car and was standing nearby when *someone else* drove the squad car. Thus, Stokes couldn't have been the driver either.  In short, none of the three defendants police officers drove the police car.

We find this argument not enough to grant summary judgment.  Defendants' argument relies entirely on plaintiff's deposition testimony.  But plaintiff has backed away from this testimony. He admits that his earlier testimony was "confused" and concedes that this discrepancy between that testimony and his current position may affect the "credibility and weight" of his testimony at trial.  (Pls. Resp. to Defs. Mot. To Deem Facts Admitted at p. 2.) While this discrepancy may ultimately prove problematical at trial, we do not find that it is, by itself, enough to justify summary judgment.  Two reasons support this conclusion.

First, a jury could find that plaintiff's imperfect memory of the exact sequence of events is understandable in light of the facts.  The encounter took place at night, after a high-speed chase, after plaintiff had been drinking, and while he was under stress of being confronted by officers with guns drawn.

Second, and more significant, an unanswered question hovers over defendants' argument: if not Officer Stokes, then who drove the car over plaintiff's leg? As defendants concede, for purposes of summary judgement, we must take as true that *someone* drove a police car over plaintiff's leg.[2] Further, the same evidence suggests that the only people present were the three officers. And everyone now is in agreement, that two of those officers were not involved. This leaves one person there – Officer Stokes. Under the reasoning of *res ipsa loquitur*, this is enough contextual evidence from which a jury could conclude that Officer Stokes was the only person who could have driven the car over plaintiff's leg.

Turning to the second allegation, regarding the cut to the head, here defendants do not even have plaintiff's testimony to rely on. Again, the analysis is similar to the car allegation. All witnesses agree that Stokes was the only one around plaintiff. Stokes himself admits that he put the handcuffs on plaintiff but denies he hit him. Plaintiff says that the person who handcuffed him delivered the blow to the head shortly thereafter. Thus, if not Stokes, who else could have hit plaintiff on the head?

Defendants at one point suggest that later arriving officers, such as Howard, could have hit plaintiff. Perhaps, but this would not square with plaintiff's testimony that the blow was delivered right at the time the handcuffs were put on. Moreover, if true, then Stokes would be an eyewitness and he has testified he saw no one else hit plaintiff. Defendants' other argument -- that plaintiff admitted he didn't see the face of the person who hit him -- fares no better. The

---

[2]*See* Defs. Reply at 2 ("Defendants realize that in a summary judgment posture they cannot adequately dispute that Plaintiff was struck with a vehicle or that he suffered an injury."). Although defendants do not say so directly in their brief, it may be that their main argument at trial will be that plaintiff hurt his leg while getting out of the car or perhaps in scrambling up the hill and that he therefore was not run over by *any* car.

failure of plaintiff to specifically identify the officer is not surprising -- and certainly not a basis

on which to grant summary judgment -- given that: (i) plaintiff was hit on the head while he was

face down on the ground and (ii) the attacker allegedly sprayed mace in plaintiff's face when he

tried to identify the officer.

## II.      Count II – The Illinois Claim Against Defendant City of Chicago Heights

The defendant City of Chicago Heights argues that summary judgment should be granted

on Count II. *See* 745 ILCS 10/2-109. The only argument raised by the City is that it cannot be

liable because none of the underlying officers are liable. (Defs. Opening Br. at 6-7.) Given our

ruling in Section I above, this argument does not apply. Therefore, we deny summary judgment

on Count II.

## III.     Count IV – The *Monell* Claim Against Defendant City of Chicago Heights

The final issue from the briefs is defendants' assertion that plaintiff has not come forward

with evidence to show that the City had a an official policy or custom which led to his alleged

unconstitutional deprivations.. *See Monell v. Dept. of Social Services of New York City*, 436 U.S.

658 (1978). It is undisputed that none of the officers had any final policymaking authority. It is

also undisputed that there were no express policies applicable to these facts.

In his response brief, plaintiff makes three main arguments. First, he argues that the City

had a policy of turning a blind eye to constitutional deprivations. (Resp. at 12.) The evidence

relied upon to support this claim is the deposition testimony of the City's Chief of Police,

Anthony Murphy, who supposedly stated that the City has a policy of allowing officers to drive

their cars over unarmed and defenseless suspects. (PF 23.)

We have read the relevant portion of the deposition referred to us by plaintiff (pages 46 to 49) and do not find that it supports plaintiff's contention. For one thing, the testimony is unclear in several places, as questioner and deponent often seemed to misunderstand each other. At one point, the Chief refers to a possible scenario where the suspect is armed or believed to be armed. Yet, everyone agrees that this fact is not present here. In any event, even if the Chief did have such an informal policy, there is no evidence that he ever communicated it to the officers here.

Second, plaintiff argues that the City does not investigate injuries sustained by arrestees unless a formal complaint is filed. Plaintiff's theory is that, if an arrestee fails to make a claim, the claim might not be investigated which in turn would "send a signal" that officers can use excessive force. (Resp. at 13.) Plaintiff fails to cite any case supporting this theory, and we find the inferences too attenuated to establish liability under *Monell*. Moreover, the City has submitted evidence showing it does have a system in place to investigate complaints and has disciplined an officer for violating the excessive force policy. (DF 41.)

Third, plaintiff argues that these officers were not sufficiently trained to recognize the "line between acceptable and excessive force." (Resp. at 13.) Defendants respond that plaintiff has failed to provide evidence needed to meet the deliberate indifference standard – namely, showing that the need for additional training was obvious. *See* Defs. Reply at 9 (citing cases). We agree with defendants. Here, it is undisputed that all the defendant officers received training in both the use of force and deadly force. (DF 45-47.) Plaintiff has submitted no evidence that would have alerted the City to the need for greater training. For all the above reasons, we grant judgment on Count IV to the defendant City of Chicago Heights.

-10-

## <u>CONCLUSION</u>

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. Judgment is granted to defendants Hofrichter and Wilson on all counts; judgment is granted in favor of the City on Count IV but not on Count II. The motion is denied as against defendant John Stokes. A status hearing is set for 2:30 p.m. on February 24, 2010.

**ENTER:**

**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** February 2, 2010